Mr. Parker was tried along with two members of the Mexican Mafia, or a member of the Mexican Mafia, with another member testifying. The majority of the case of probably 90, reading through the transcript, 90, 95 percent of the case was not about the charges that Mr. Parker was convicted of, which was the conspiracy to possess a destructive device and possession of a destructive device. The case largely was about the drug dealing and other activities of the Mexican Mafia. Within that time, there was numerous evidence presented concerning kidnaps, attempted murders, murders, other acts of violence, extensive drug dealing, all of which Mr. Parker had no part of. And it becomes, I think, even more crucial that we're dealing with the Mexican Mafia with where this case was tried. In Tucson, we're essentially a border town. We're 50 or 60 miles from the border. But weekly, if not daily, every citizen in Tucson is reading about the acts of the Mexican Mafia. Kidnappings have taken place, acts of violence on both sides of the border. Correct me if I'm wrong. My understanding of the Mexican Mafia is that it's actually an American organization of Mexicans. And therein is a lot of the problem. So it's not as though we're – I don't think we're talking about Mexican drug cartels, are we? No, but that, I think, is part of the problem because within the states or within Arizona, they're also called the Mexican Mafia. Theoretically, these guys shouldn't have been called the New Mexico Mafia because I think that was their original name. But in the course of the trial, they were simply referred to as the Mexican Mafia, which overlaps with a similar name that the drug cartels have been given by the press. Trial counsel had urged the motion to sever. And I'm here today. I clearly understand the burden on the appellate and that we must show a clear or manifest prejudice by Judge Bury failing to sever the defendant. This is just a case, I think, where the rub-off was so great. The first case ended in a mistrial, which indicates the jury was having some kind of problem, although it's not on the record what their – led them to the hung jury. Now, I confess I don't know anything about the first trial except that it was a mistrial. Was it only these two defendants in the first trial? Yes. And it hung – my understanding is the hung jury. And hung jury, then, obviously, is to both defendants. Correct. Counsel, I have a question about what would have happened if the case had been severed, because my understanding is that your client was essentially – or he argued that he was along for the ride. Right. And when they went to throw these Molotov cocktails. I'm summarizing, of course. Of course. But my understanding is that there was testimony from the other, I guess, originally a defendant, but then a witness, that your client had been told that the Mexican mafia would appreciate his help and would remember his help, and that he may have been trying to impress them. Wouldn't that testimony, which I appreciate that I'm paraphrasing it, but. Correct. Wouldn't that testimony have been admissible had he been tried separately? I mean, the jury would have heard about Mexican mafia, wouldn't they? Yeah, to some extent, but certainly not the activities, you know, the killings, all that stuff. It would have been a very – I think the only thing that would have been relevant and, frankly, I'm not sure even if a motion would have challenged that. And if he was tried separately without this other stuff in, I think the jury would have been much better able to focus on what the real issue was, and it came down to credibility. The whole trial challenged by the – I didn't try the case, obviously, but the trial counsel was that the two people testifying against him weren't credible. And I think when you hear everything that the Mexican mafia did, I think it's hard for a jury to say, well, this guy wasn't a Mexican mafia, but then why is he where he's at? You know, he's with them, he's. The testimony by the two witnesses, Polito and Moser, if I'm pronouncing their names correctly, is pretty clean with respect to your client. Both of them say they were in the car. Both of them say that the three of them, those two plus Mr. Parker, threw the, I guess, the beer bottles with gasoline in them, the Molotov cocktails. Polito didn't really know Parker ahead of time. Moser, on the other hand, was living in the house, according to his testimony, with Parker. So, I mean, it's pretty clean testimony. The way that Ms. Udall tried to undermine the testimony, as indeed did the defense lawyer for the other, for the co-defendant, was simply to try to undermine the credibility, like what kind of a deal are you guys getting here? It didn't seem to me that there was a lot of potential for confusion as to the nature of the case against Mr. Parker, and it also seemed to me that the undermining of the credibility of the witnesses was actually made a little more powerful, because their credibility was deeply tied up with their association with the Mexican Mafia and the deals that they were getting. So I'm not sure that the joinder really hurt your client, because if we had had just a simple case of two people coming in and testifying, yeah, yeah, we were in the car, the three of us threw the Molotov cocktails, and the impeaching as to what kind of deals you guys are getting are coming in without context, I'm not sure that the impeachment would have been as powerful. And I did notice, of course, as I'm sure you did, too, that the co-defendant was not convicted on all counts. So how do you respond to that? And I guess I can certainly understand the Court's point. I can tell you, trying cases for 36 years, I would have rather tried him alone. No, of course, essentially, as always would. Counsel, Judge Gould, if I could ask you a question, please. Yes, Your Honor. I have a question. What instructions did the judge give the jury as to whether to consider Mr. Parker to be a member of the Mexican Mafia or part of the drug dealing? The Court, I believe, at the beginning of the case, if I'm not wrong, at the end of the case, instructed the jury, one, that Mr. Parker was not a member of the Mexican Mafia. He gave a one-line limiting instruction. And he gave, at least what's in Tucson, always the standard instructions to consider each count and the evidence against each individual. I believe it was that. So then how would you – how do you deal with the precedent we have that we presume a jury follows the instructions they're given? I mean, how does that fit with your theory of prejudice? Okay. I know the Ninth Circuit says they presume. I just think we throw some common sense into it. And jurors don't have blinders. I mean, I wish we did, and I understand the limiting instruction. But I, like I say, after 36 years and talking to hundreds of jurors, it's not as clean as we would like it to be. You know, they simply don't always follow the instructions. They simply don't always understand the instructions. And they never put out of their minds their common experiences and what they've heard. So I think we're idealistic to think that happens. And that's why I think there's got – obviously, the severance rule is there for purpose, but it appears it's never – rarely used in the Federal system, much more in the State system. And I think in cases like this where there's such overwhelming evidence – And the rule itself acknowledges that there are instances where eliminating constructions, you know, aren't going to be sufficient to protect the defendant. And I think this is one of these cases where, given where it was tried, the nature of the Mexican Mafia, and the inherent prejudice to them, that I think we can't sit here and say that it did not have the potential to prejudice Mr. Park in his defense. Roberts. Okay. You've used up your time. Let's hear from the government, but we will give you a chance to respond. Thank you, Your Honors. May it please the Court. My name is Ryan D. Joe. I represent the United States Attorney's Office for the District of Arizona. I'd like to speak about two points that Your Honors have brought up. One, how the trial would have been different had there been severance. And two, the fact that the jurors did not find the co-defendant, Alcantar, guilty on all counts. The first argument is how the trial would have been different had it been severed, and it would not have been that different. I think counsel used the term 95 percent of the trial about basically Alcantar or drug dealing or the new Mexican Mafia, but that wasn't the case. When you look at the record, the beginning part of the case was about the aftermath of the act itself. Talking with Mr. O'Hara on the stand, with his neighbor who helped him out, with the first responders, and then leading to the investigation of Pulido. Forgive me, that's the homeowner? Yes, Mr. O'Hara is the homeowner. I have to say that that part of the trial was all atmospherics. You're just trying to get the jury to feel sorry for this old guy who's retired to Tucson from Chicago and so on. But, I mean, sure, okay. Well, that was not a very complicated part of the trial. No, but again, it was a part of the trial that would have been the same even had severance been granted. But they wouldn't have heard, the jury wouldn't have heard, surely, about the attempted murder, about all of that, you know, much more egregious conduct, would they? Not necessarily, because as was evidenced by Agent Vujulis' testimony, his dealings with Pulido in a separate matter led to Pulido speaking about what happened in the firebombing, and that involved the why. And when Parker was charged in the conspiracy in count one to possess the Molotov cocktails, evidence of why would come out. Evidence that the investigation led to Pulido in this New Mexican Mafia faction that led to the sending of the message. That would all be relevant testimony for the conspiracy to possess the Molotov cocktail, the act itself. And as Your Honor pointed out, there was testimony from Mosier about speaking with Parker about gaining the respect, earning respect of the New Mexican Mafia. So Parker engages in a conspiracy with the New Mexican Mafia, even though he's not a member, to commit this act on their behalf. So the trials would have been largely the same, even had severance been granted. And then going to the second point about the jury not finding Alcantar guilty on all counts shows that they really did, not just beyond what the case law says, that we're presumed that jurors follow instructions. Demonstrated that by actually separating out the evidence against Alcantar and really taking into consideration the evidence as to each defendant and as to each count. Your client, or sorry, this defendant, Mr. Parker, was charged with two counts and convicted of both, right? Correct. And the other defendant was charged with how many and acquitted of how many? Seven counts, and he was convicted of five. The counts he was not convicted of was carrying an explosive during the commission of a felony under Title 18, United States Code, Section 844H, and a conspiracy count under that same statute. I agree with Judge Fletcher that there's something to be said about the notion that juxtaposed against the other defendant's conduct. I'm not sure how prejudicial this is. There's a – there's going to be testimony at a joint trial or a single trial of this man possessing Molotov cocktails and throwing them, I think. So I guess you could make the argument that, as I said, juxtaposed against the other defendant's conduct, that he really looks significantly less culpable. But be that as it may, opposing counsel is not wrong, is he? That severance is granted a whole lot more often in State courts. I can't really speak to that. I don't practice in or nor have I ever practiced in State court. You might want to trust me on that. I will trust you on that? Yes. I'm just saying I can't speak from experience on that, but that does seem to be the  But you don't want to speak to that? I do not want to speak to that, but I will say that in terms of just looking at severance in general, not really worrying about the Federal standard as opposed to the State standard and how often it's granted in each spot, I think when you're talking about the prejudicial effect, which I think speaks to the heart of the matter, no matter where you are, whether it's State court or Federal court, any undue prejudice argument here I think falls short, not only because there was an argument of counsel that the Mexican Mafia or the new Mexican Mafia evicts some kind of a motion. They're not very well known. I think there was an argument to try and tie them to border crime, to cartels. That's simply not the case. It's not that the term Mexican Mafia is not used with drug cartels. You hear the names of the drug cartels when they're spoken of in the press. The average person does not know what the Mexican Mafia is, who the Mexican Mafia is, and as the testimony came out, it's basically a prison gang, and people are not aware of the Mexican Mafia. It doesn't evict any kind of a motion. Like if you said this was a faction of the Sinaloa cartel operating in Tucson selling drugs or something of that nature, and plus the act itself that Parker was involved in, the throwing of Molotov cocktails, is a very, very heinous thing. I think there would be more of an argument certainly if he had a lesser role, say Moser didn't tell them what was going on and said, you know, we're going to use your car, you're just going to drive us by a house, you know, we're going to break some windows, scare some people, we'll run around the corner, get back in your car and drive away. But that's not the case. He held a Molotov cocktail, he ran with Pulido, he ran with Moser, he threw it at the house and came back. And I think that also speaks to the prejudicial effect, because how much prejudice is going to spill over from being affiliated with a Mexican Mafia member, juxtaposed with the actual act that Parker committed, throwing a Molotov cocktail at a house without putting much thought into what he was doing or why he was doing it, just that he was going along with Moser, may or may not have been trying to earn the respect of the Mexican Mafia, but still did throw a 40-ounce bottle filled with gasoline at a house. Let me ask you this. How much additional work on the part of the attorney's office and how much additional court time would have been required to do two separate trials? Because you do look at this and you say there's one big fish and there's one minnow, and you tried the two of them together. I mean, what you've got is some stupid young man who goes along, because Moser says, hey, you want to come along and throw some Molotov cocktails at a house, and he says yes. Moser's living in the house with his sister, the girlfriend of Moser, and that stupid kid says yes. I understand that you want to try them together. I'm trying to figure out how much effort would have been to try them separately. It would have been very near the amount of effort it took to try the case as it was now. How many days' trial was this trial? Well, it wasn't actually a six-day trial as was listed. The jury selection started on a Tuesday. There was Tuesday afternoon, Wednesday, Thursday. I believe there was no testimony on Friday. There was rebuttal and argument on Monday, and jury deliberations ran into Tuesday for the verdict. So it's about a three-day trial for the attorney. About a three-day trial, more or less. Right. You know, you guys don't get enough trial experience. I think I would argue with that. I was speaking with counsel earlier. That was my fourth trial out of five I did in about the first two months of 2012. So although I could have fit it in somewhere if we had to do it again. But the opposing counsel would have been happier if it had been five out of six. Yes. Even more experience. Yes. And so this I don't know the answer to this question, so this is not a trick question. This is a curiosity question. Is there a U.S. attorney's manual or a guideline sort of, is there something in the office that tells you as a matter of sort of government policy when you join or when you sever? I don't, I'm not aware of any really hard, fast rules or a specific guidance or guideline on it. I think we follow the rules of Rule 14 and the case law as dictated by the Ninth Circuit. The preference to charge people to, I'm sorry, the preference to try people together who are charged together unless there is some clear manifest injustice. And that's really up to us on a case-by-case basis to look and see if there is something that really requires severance, such as some of the examples I mentioned earlier. You know, if the facts were different and Parker had just driven the car, wasn't aware of any Mexican mafia, or if he had some lesser role and you had a faction of, say, the Sinaloa cartel or the Gulf Coast cartel that these guys were allegedly affiliated with, and some of the things they had done had gone beyond just, you know, threats and talk, which was a lot of the case, specifically regarding the Mexican mafia. It was about a kidnapping, but it was someone they were dealing drugs with. It wasn't like they were taking people off the streets and just doing random acts of violence. This was a drug deal. And it sounds callous, but those type of things happen when dealing drugs. But again, it didn't rise the level of, you know, really setting off an internal kind of alarm, like this is something that really needs to be separated because I don't think I would be able or anyone else would be able to really compartmentalize the evidence or separate what you're hearing about the Mexican mafia. But in this case, part of the Mexican mafia and what they do and why they sell drugs and why they raise money is part of the story of the case. And it would be really hard to sever out the story of the case. Well, but there were really two different stories. One of them was the firebombing of the house that they thought was Figueroa's. It turned out not to have been. But the other part of the story, the more complicated part of the story, and the story of why you were really after the co-defendant was they had attempted to kill Figueroa and kind of keystone cops. They kind of lose their way and decide they're going to get $6,000 from him instead, and then he only pays a little bit, and so they're after him some more. And the drug dealing and all that stuff, I mean, that's why you were really after the co-defendant. And then you've got this other event where they make a mistake and they throw Molotov cocktails at somebody else's house, and nobody's hurt, property damage. I'm not minimizing the crime. It clearly is a crime, and I'm not unhappy that the government is prosecuting that crime. But they actually were quite distinct. Right. But, again, there are parts of the whole. The firebombing is the what. The drug dealing and the dealings with Figueroa are the why. And those two coming together completed the story on the other counts as they related to Alcantar, but also the conspiracy count as it related to both Alcantar and Parker, the actual what. So I believe those could not be just separated out, and I think the jury did do a good job of listening to the instructions and was able to compartmentalize the evidence in this case. Thank you. Thank you, Your Honor. Unless there are other questions from the bench. Okay. And none here. Thank you. Okay. Thank you, Your Honor. Would you like a minute? Just briefly, I really don't have a whole lot to add. I think the Court has a great handle on the issue, and I think it's kind of where you're going to have to look at all the facts presented and make that call about the prejudice. I would disagree with the U.S. government about the characterization because I do drug work, and the cartel is often called the Mexican Mafia, not only by the press, but actually by agents and other people involved in the system. And I don't think this jury would really, given the facts, to distinguish or get rid of that prejudice thinking. Okay. Thank both of you for your arguments. The case of United States v. Parker is now submitted for decision.
judges: Fletcher, Gould, Christen